## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TAMPA

**DEREK RUNION AND**
**FLORIDA CAPITAL ASSETS,**
**LLC,**

     **Plaintiff,**

v.                                                         **CASE NO.:**

**PAUL BERNARD, IBEX ENERGY,**    **JURY TRIAL DEMANDED**
**INC., and JOHN BIALLAS,**

    **Defendants.**

_____/

## COMPLAINT

Plaintiff's Derek Runion and Florida Capital Assets, LLC, by and through his

undersigned counsel, for their Complaint against Defendants, Paul Bernard, Ibex Energy,

Inc., and John Biallas, individually and collectively, and states as follows:

### NATURE OF THE ACTION

1.    This is a diversity action involving tort claims and statutory claims

under Florida Law. Plaintiff asserts claims against Defendants for Breach of contract,

unjust enrichment, conversion, civil theft, and fraud.

### THE PARTIES

2.    Plaintiff Derek Runion is an individual. Upon information and belief,

Derek Runion resides in Florida.

3.    Plaintiff Capital Assets, LLC, is a Florida Limited Liability, with its

principal place of business at 1430 SE 16th Pl Suite A Cape Coral, FL 33990

4.    Defendant Paul Bernard (hereinafter "Bernard") is an individual and

president of Ibex Energy, Inc. Upon information and belief, Bernard is a resident of

California.

5.      Ibex Energy, Inc., (hereinafter "Ibex") is a corporation, with its principal place of business at 25 Crescent Drive, Pleasant Hill, California 94523.

6.      Defendant John Biallas (hereinafter "Biallas") is an individual.  Upon information and belief, Biallas is a resident of Saint Charles, Illinois.

7.      Defendant John Biallas (hereinafter "Biallas") is an individual residing at 3N918 Sunrise Ln Saint Charles, IL 60174-5081

## JURISDICTION AND VENUE

8.  The Court also has subject matter jurisdiction in this action pursuant to 28 USC 1332 because the Plaintiff and Defendants are citizens of different States and more than $75,000.00 is in controversy.  Plaintiff seeks $400,000.00 due under the contract and its breach.  Plaintiff seeks treble damages and attorneys fees via civil theft.

9.  The Court has specific personal jurisdiction over Defendant's because he has contacts with the State of Florida, and has committed tortious acts directed to Florida.  Among other things, Defendant(s) conspired to commit a series of tortious acts in the State of Florida.

10. By the contract, Defendants Bernard, Ibex Energy, Inc., and Biallas expressly consented to the exclusive jurisdiction of the Middle District of Florida.  Defendants Bernard, Ibex Energy, Inc., and Biallas signed an Agreement Plaintiff wherein the parties consented to the exclusive jurisdiction of the Federal Court of the Middle District of Florida for any dispute involving the Agreement.

11. Venue is proper in this Court pursuant to 28 USC 1391 as a substantial part of the events giving rise to Plaintiff's claims occurred in Florida, which is within the judicial

district. Moreover, as explained above, Defendants Bernard, Ibex, Inc., and Biallas, agreed to venue in this Court.

## FACTS COMMON TO ALL COUNTS

12. On or about December 4, 2019, Derek Runion received a phone call from Danny Caballer, Alice Constantine, and Brian Bargren.

13. Caballer and Constantinee advised they were seeking $200,000.00 USD for purposes of purchasing and reselling petroleum goods. The goods in question were jet fuel A-1.

14. The jet fuel in question was jet fuel A-1.

15. Jet fuel A-1 is a highly combustible, very refined petro product.

16. A-1 is used for jets, jetliners, and other aerial transporters.

17. Petrochemical transactions are highly regulated by both Federal, State, And International governments, as well as other worldwide regulators such as Oil Producing and Exporting Countries, commonly referred to as OPEC.

18. Large transactions of this nature usually involve large companies which producers and exporters of petrochemicals.

19. They also are, generally, multi-million dollar transactions.

20. In the State of Texas, the Railroad Commission, in its Oil and Gas Division, regulates the exploration, production, and transportation of petro chemicals in and on the State of Texas.

21. As the oil and gas industry is heavily regulated, there are numerous access to public records, including but not limited to: names of explorers, producers, transporters, buyers, sellers, brokers, middleman, types of petro-chemicals being transported, in what

amounts, countries of origin, the contracts for the buying and selling, commission contracts, etc.

22. In essence, any parties to an oil transaction, would be made available by the Government and accessible in public records.

23. Large exporters of petro-chemicals generally do not use brokers or middlemen for the buying and selling of their product.

24. This product was alleged to be coming from Gazprom Neft PJSC.

25. Gazprom is a Russian Federation corporation and is a large scale producer of petro products.

26. Gazprom Neft does not utilize brokers nor establish contractual relationships with any parties to sell their products.

27. All sales of Gazprom products are offered for sale internally by existing members of Gazprom Neft PJSC.

28. This is referred to a being "refinery direct."

29. Neither Gazprom Neft PJSC nor any petro-chemical terminal and storage companies take deposits or "up-front" monies for transactions. Deposits are taken when the petroleum has arrived for terminal and storage, has been successfully tested (an injection and DTS report) and approved by a buyer.

30. From at least early 2019 until today, Paul Bernard, John Biallas, Alice Constantine, Danny Caballer, a person purported to be David McGee, Damon Kelly, as well as those known and unknown, have operated as co-conspirators seeking to defraud investors by asking investors to pay up-front fees for the terminal and storage of petro-chemicals.

31. The co-conspirators seek persons to pay up-front fees for petro-chemical transactions. It should be noted, in the industry, up-front fees are not utilized for "possible" transactions.

32. The co-conspirator utilize Alice Constantine to seek to convince a possible buyer of the rewards of conducting a transaction.

33. The co-conspirators utilize Paul Bernard, acting in his individual capacity and also acting as president of Ibex Energy, Inc., and John Biallas to offer legitimacy to the fraud by referencing "transactions about to close, utilizing a lawyer's escrow, and discussing how the parties have discussed the matter and shown documents to an expert in the industry whom has reviewed and approved the same.

34. Ibex Energy, Inc., is a closely held, single person corporation. Said single person is Paul Biallas.

35. Damon Kelly, acting in an individual capacity, and as president of Colonial Grade Trading, LLC and Black Wolf Energy, LLC purports to be an expert in the field of petrochemicals so as to verify documents and procedures in petro-chemical transactions.

36. Then, and lastly, to receive payment, they utilize David McGee and Q&S Imports, LLC a company in Georgia with no connection to petro-chemicals, nor to the terminal and storage of fuels -- to receive the monies.

37. These persons form the enterprise, each person or persons with a specific role to engage in and further the scheme to defraud, wire fraud, and R.I.C.O.

38. This enterprise and conspiracy to commit fraud has been ongoing since at least October of 2019.

39. On or about December 4, 2019, Danny Caballer and Alice Constantine sought out Derek Ruinon to defraud Runion into investing with Paul Bernard and John Biallas.

40. Danny Caballer and Alice Constantine sought Runion for purposes of asking Runion to Invest in Ibex Energy, Inc., by making a $200,000.00 investment for the purpose of paying for the terminal and storage of jet fuel pursuant to a buy and sell contract Bernard and Biallas insisted existed.

41. After that phone conversation on December 4, 2019, Alice Constantine called Runion to discuss (again) the transaction.

42. On that second call, Alice Constantine, Danny Caballer, Brian Bargren, and Paul Bernard were on the line with Runion.

43. Runion exchanged contact information for Paul Bernard.

44. Bernard indicated he was the president and owner of Ibex Energy, Inc.

45. Bernard said he was involved in the petro-chemical industry.

46. Bernard indicated he (Bernard) had multiple petro-chemical transactions ongoing, and Bernard said he had used Biallas IOLTA for these transactions.

47. Bernard indicated he (Bernard) had brought individually, $900,000.00, to aid one of the three transactions.

48. Biallas verified Bernard's representations.

49. Bernard indicated he had an expert he consulted with for purposes of verifying the transactions.

50. Bernard said he needed $200,000.00 USD for purposes of paying a deposit for the purchase and resell of two million barrels of jet fuel.

51. Jet fuel is transported by tanker to terminals.

52. The petrochemical is offloaded from the tanker via the terminals and stored in tanks.

53. Bernard advised Runion he needed the $200,000.00 to pay a company by the name of Terminal & Storage, located in Galveston, Texas.

54. The contact person for Terminal & Storage, LLC, in Galveston, Texas, was David McGee (the Plaintiff believes the first name is fraudulent and Mr. McGee used a false name to further the fraud).

55. Terminal & Storage maintained a world wide web presence at the following link: www.terstoragellc.com/contact.html.

56. The website is a fraud and utilized to further the enterprises scheme to defraud.

57. The front page of the website reflects the company name, images of petro equipment, and contact information.

58. The Terminal & Storage, LLC reflected on the website was a fraudulent Texas corporation which hijacked a real Texas corporation Terminalling & Storage, LLC, which has nothing to do with the ownership of equipment or involvement in the petrochemical industry.

59. David McGee is not involved in the petrochemical industry.

60. David McGee works with Bernard and others to commit fraud in the petrochemical industry.

61. Runion was not told by Bernard Terminal & Storage, LLC, was a fraudulent website.

62. Bernard offered to Runion (in exchange for payment of $200,000.00) a return

of $300,000.00 within sixty days, or a return of $400,000.00 if payment was received between days sixty and ninety.

63. Bernard proposed to Runion a "Proceeds Sharing Agreement (hereinafter PSA)."

64. The PSA gave Ibex and Bernard 60 (sixty) days from December 4, 2019, to close the transaction and pay Runion and FCA $300,000.00 (200,000 initial investment with $100,000.00 additional monies as profit).

65. If the transaction did not close within 60 (sixty) days, Ibex and Bernard were to pay $400,000.00 to Runion and FCA.

66. The PSA also stated if Ibex and Bernard completed any "other similar type" transaction, Ibex and Bernard were to direct Biallas to pay Runion and FCA from those monies.

67. Biallas also signed the PSA.

68. Biallas, therefore, with Bernard, contracted to pay Runion the monies.

69. As inducement to receive the deposit from Runion, Bernard made numerous untrue representations to Runion.

70. Bernard advised Runion the contract with Terminal & Storage had a "no-splash" provision.

71. Bernard explained this meant if no petro-chemicals made it into the tank, then the monies (the $200,000.00) would be fully refunded.

72. Bernard offered Runion falsified and manufactured documents to verify the transaction.

73. The documents included a proof of product for sale from a petroleum refinery.

See Attached as Exhibit "A."

74. Said documents were forged by Bernard, and possibly other parties.

75. Said documents were fraudulent.

76. Bernard said the sales contract came from a jet fuel supplier refinery.

77. Refineries do not sell petroleum products via brokers such as Bernard.

78. Said sales contract was never produced and was not known to be fraudulent by Runion.

79. Additionally, Bernard offered a copy of a petroleum storage contract as further inducement.

80. Said documents were fraudulent.

81. As additional inducement, Bernard also offered Runion a piece of property in Sioux City, Iowa as collateral.

82. Said property, with an address of 722 Nebraska Street, Sioux City, Iowa, was not owned by Bernard.

83. Said property was already subject to demolition proceedings by Woodbury County, Iowa government.

84. Said project was subject to demolition twelve months prior to Bernard's alleged ownership.

85. Bernard was under an agreement and obligation to rehabilitate the same property from six years prior.

86. Bernard had failed to comply with the County's orders, and the property was scheduled for demolition.

87. At the time Bernard offered the property as collateral for Runions monies,

Bernard knew he could not comply with the counties orders and the property was subject to demolition.

88. In fact, Bernard never took any steps to rehabilitate the property.

89. As the property was subject to demolition, the property value was nominal.

90. In fact, the several buy/sell transactions of this property prior were for $20,000.00 or less.

91. Knowing Bernard could not complete the rehabilitation of the property, Bernard, as further inducement, offered an architectural letter from CMBA Architects – dated March 28, 2019, indicating the value of the property as rehabilitated would be in excess of 4.35 million USD.  The letter as attached as Exhibit "B."

92. It should be noted, Zillow.com indicates an assessed value of $164,000.00.

93. Said property was demolished by Woodbury County, Iowa.

94. Bernard always represented he owned said property.

95. Bernards attempt to offer the property as collateral was fraudulent and offered as an inducement for Runion to pay IBEX his proceeds.

96. Bernard indicated the petro-chemical was already in Houston, Texas.

97. Bernard also indicated to Runion Bernard had an escrow attorney.

98. The escrow attorney's name is John Biallas.

99. Biallas spoke to Runion on numerous occasions.

100.    Biallas indicated to Runion Bernard had petrochemical contracts, to include a contract wherein Bernard contributed $900,000.00 of his own monies, said information which was confirmed by Biallas.

101.    Biallas indicated he verified the information.

102.   Biallas bolstered Bernard by explaining to Runion – that Bernard and Biallas -- had consulted with a petrochemical expert and the fraudulent Bernard documents were in fact documents utilized by the petrochemical industry.

103.   Biallas indicated he had personal relationships with the vendors in this transaction.

104.   Biallas said he had completed with the same vendors a prior transaction involving chinese buyers.

105.   Biallas used his position as an attorney licensed in the State of Illinois to put Runion at ease that the transaction was legitimate.

106.   Biallas used his position as an attorney to assure Runion that Biallas and Bernard had consulted "experts" and the transaction was legitimate.

107.   Biallas advised Runion he was escrow agent for at least three other petro-chemical transactions, one of which Bernard allegedly was personally financially involved.

108.   Bernard and Biallas induced Runion to send a $200,000.00 payment to Biallas IOLTA account.

109.   A contract, attached as Exhibit "C," established the terms of the transaction.

110.   On December 5, 2019, Biallas sent the first wire for $100,000.00 to Q&S Imports, LLC.

111.   As Q&S Imports, LLC, was located in Georgia, Runion contacted Biallas to discuss why the funds went to a company other than T&S, LLC.

112.   Runion explained to Biallas that Q&S Imports, LLC was in Georgia, the

corporation was registered to an apartment, and that he, Runion, believed there was fraud.

113.   Biallas was clearly notified by Runion about the fraud after the first wire.

114.   Runion asked Biallas and Bernard on numerous occasions between December 4, 2019, and December 11, 2019, to send him copies (redacted if necessary to protect buyer and supplier information) to verify the transaction.

115.   Neither Bernard nor Biallas sent anything to confirm the request made by Runion.

116.   Bernard then hired Biallas to enter into an attorney-client relationship.

117.   Bernard advised Biallas to cease contact and communication with Runion.

118.   Bernard then ordered Biallas to send and payout the balance of the monies.

119.   Biallas sent subsequent wires for another $90,000.00.

120.   All wires were distributed in violation of the contract.

121.   Bernard used bank to bank requested wires to facilitate the fraudulent transaction.

122.   Biallas used bank to bank wires to facilitate the fraudulent transactions.

123.   Bernard utilized electronic mail communications to further the fraud.

124.   Biallas paid Damon Kelly c/o Colonial Grade Trading, LLC, $5,000.00 from the balance of those monies.

125.   Biallas paid himself $5,000.00 from the balance of those monies.

126.   Damon Kelly was responsible for posting cryptic messages on social media making inferences that the transaction was almost complete.

127.   Damon Kelly's social media referenced:

    a. "Bringing it home." A reference to jet fuel by reflecting a picture of a jetliner in the air with a sunset as a background;

    b. A picture of a tiger and commenting "is there a tiger in your tank."

    c. A picture of a tanker with the caption "Elvis has left the port." Implying a delivery of jet fuel arrived in Texas and the tanker was leaving the port.

128.    These social media posts were designed to infer to any individual whom made the terminal and storage deposit that the oil tanker had arrived, offloaded its product, and left the terminal and storage facility.

129.    On December 9, 2019, Bernard provided Runion an update.

130.    Bernard advised:

    a. He had been on the phone with several participants in his current petroleum transaction;

    b. The storage vendor has been paid off and sent confirming documents to the refinery/seller;

    c. The refinery has acknowledged receipt of those documents and are in the process of generating then signing the next set of documents.

131.    None of the aforementioned documents were produced to Runion.

132.    In fact, none of Bernard's purported transactions completed.

133.    Despite numerous telephonic demands for return of the funds by Runion, the monies have not been returned.

134.    Despite written correspondence, no monies have been paid to Runion.

135.    Ibex and Bernard have breached the PSA.

## COUNT I
## BREACH OF CONTRACT
### (Against Defendant's Paul Bernard and John Biallas)

136.    This is an action for breach of contract.

137.    Plaintiff adopts and re-alleges paragraphs 1-135.

138.    Derek Runion, Paul Bernard, and John Biallas entered into a written

Contract on December 4, 2019, attached as Exhibit "C."

139.   Paul Bernard and John Biallas breached the contract by engaging in fraud, misappropriating Runion's monies, and  failing to return any monies timely.

140.   Defendant's Bernard and Biallas are liable in damages in excess of $400,000.00, the exact amount to be proven at trial.

**COUNT II**
**CIVIL THEFT**

141.   Plaintiff adopts and re-alleges paragraphs 1-141 As set forth herein.

142.   This is an action for civil theft pursuant to Fla. Stat. 772.11

143.   Defendant have obtained and/or used $200,000.00 of Plaintiff's money Without permission and to further fraud.

144.   Defendants did unlawfully and knowingly use or endeavor to use Plaintiff's money and did knowingly deprive or endeavor to deprive Plaintiff of its money with intent to temporarily or permanently deprive Plaintiff of its right to the money and benefit thereof, all for Defendant's own use, or the use of any person not entitled thereto, in violation of Florida Statute 812.04.

145.   Pursuant to Florida Statute 772.11, Plaintiff made a final written statutory demand for its property on February 25, 2020. A copy of the statutory demand sent to Defendants, Paul Bernard, are attached hereto as composite exhibit "D."

146.   To date, and despite demand by Plaintiff, defendants have failed to return Plaintiff's property

147.   As a direct and proximate cause of defendants' unlawful actioins, Plaintiff was and continues to be deprived of its right to its property and the benefit therefrom, and has suffered damages in the amount of $200,000.00

148.   Pursuant to Florida Statue 772.11, Plaintiff is entitled to treble damages in the minimum amount of $600,000.00 for the theft of its monies committed by defendant.

149.   As a direct result of Plaintiff depriving Plaintiff of its rights to possess and enjoy its money and the benefit therefrom, and defendants' continuing failure and refusal to return Plaintiff's property, Plaintiff was required to retain counsel and obligated to pay its counsel a fee.

150.   Plaintiff is entitled to an award of attorney's fees pursuant to Fla. Stat. 772.11

WHEREFORE, Plaintiff demands judgment in favor and against Defendant's, jointly and severely as follows:

A. Treble damages in the amount of $600,000.00
B. Pre-judgment interest from the date the monies were paid;
C. Attorney's fees and costs incurred in this matter;
D. Any other and further relief this court deems proper.

## COUNT III
## CONVERSION

151.   Plaintiff adopts and re-alleges paragraphs 1-150 As set forth herein.

152.   This is an action for conversion of the Plaintiff's private property by the Defendants.

153.   At all times herein mentioned, Plaintiff was, and still is, the owner and was, and still is entitled to immediate possession of cash in the amount of $400,000.00 which was wrongly misappropriated as set forth hereinabove.

154.   Since December of 2019, Defendants have knowingly, unlawfully, maliciously, and with intent to indefinitely or permanently deprive Plaintiff of its property, took possession of Plaintiff's property, and utilized the same fraudulently.

155.   Defendants have, without the consent of the Plaintiff, converted to their own use the above mentioned property.

156.   Plaintiff made a written demand for return of its property, on Jnauary ??, 2020, but Defendants' have failed to return Plaintiff's property.

157.   As a direct and proximate result of the wrongful acts of the defendants, Plaintiff has suffered general damages in the amount of at least $400,000.00.

158.   As a direct result of Plaintiff's conversion of Plaintiff property, and defendant's continuing failure and refusal to return Plaintiff's property, Plaintiff was required to retain counsel and its obligated to pay its counsel a fee.

159.   Plaintiff is entitled to an award of attorney's fees pursuant to Fla. Stat. 57.105.

WHEREFORE, Plaintiff demands judgment in its favor and against the defendants, jointly and severally as follows:

A. Damages in the amount of $400,000.00; and
B. Pre-judgment interest from the date the monies were paid;
C. Attorney's fees and costs incurred in bringing this action;
D. Any other and further relief this court deems proper.

## COUNT IV
## CIVIL CONSPIRACY FOR FRAUD

160.   Plaintiff adopts and re-alleges paragraphs 1-159 As set forth herein.

161.   This is a cause of action for civil conspiracy.

162.   Defendants presented forged documents as well as made fraudulent statements to the Plaintiff.

163.   The documents from Gazpron Neft are fraudulent, do not present valid proof of product, and in fact, did not provide proof of a petroleum transaction.

164. The statements made by Defendant's are fraudulent in that they represented petroleum transactions which were non-existent.

165. Defendant's intended for the Plaintiff to rely on the fact the fraudulent and forged documents were real and that a petroleum transaction was taking place based on the documentation.

166. Defendant's presented the fraudulent documents to the Plaintiff with the express purpose of inducing the Plaintiff to act thereon, i.e., to make payments on the fraudulent transactions.

167. Plaintiff relied on those documents and made a payment to the Defendant in the amount of $200,000.00.

168. Defendants knew or should have known that the petroleum transaction was not legitimate and that the documents were fraudulent and/or forgeries.

169. Defendant's participated in the fraud by making false statements to further induce Plaintiff to pay the monies.

170. Defendants knew the statements to be false and intended for Plaintiff to rely upon them.

171. Plaintiff, at the time, believed Defendants, and did in fact rely upon them.

172. The actions of all of the defendant's constitute a civil conspiracy justifying an award of compensatory and consequential damages.

173. The Defendants committed unlawful acts in furtherance of the conspiracy and there was actual damages to the Plaintiff as a result of the conspiracy in the form of the wrongful taking of Plaintiffs money, specifically $200,000.00.

WHEREFORE, Plaintiff demands judgment in its favor and against the

defendants, jointly and severally as follows:

    A. Damages in the amount of $200,000.00; and
    B. Pre-judgment interest from the date the monies were paid;
    C. Attorney's fees and costs incurred in bringing this action;
    D. Any other and further relief this court deems proper.

## COUNT V
## AIDING AND ABETTING FRAUD

174.   Plaintiff adopts and re-alleges paragraphs 1-173 as set forth fully herein.

175.   As set forth above, Defendants committed fraud upon Plaintiff.

176.   Defendants knew of the fraud committed by Bernard and Biallas and aided

and abetted in said fraud by knowingly making false statements to indue Plaintiff to pay

the monies and advance the fraud.

177.   As a direct and proximate result of the defendants aiding and abetting and

advancing the fraud committed upon Plaintiff, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment in its favor and against the

Defendants, jointly and severally as follows:

    A. Damages in the amount of $200,000.00; and
    B. Pre-judgment interest from the date the monies were paid;
    C. Attorney's fees and costs incurred in bringing this action;
    D. Any other and further relief this court deems proper.

## COUNT VI
## BREACH OF CONTRACT

178.   Plaintiff adopts and re-alleges paragraphs 1-177 As set forth herein.

179.   On December 4, 2019, Plaintiff and Defendant entered into a contract with

Defendants Paul Bernard and John Biallas.

180.   As consideration for the contract, Plaintiff paid Biallas (for the benefit of

Bernard), monies so as to pay for the terminalling and storage of petroleum products.

181.   After sixty (60) days, $300,000.00 (three hundred thousand dollars) was to be returned, and/or after ninety (90) days, $400,000.00 (four hundred thousand dollars) returned.

182.   On February 4, 2020, Defendant Bernard breached the contract by not paying the monies due to Plaintiff in the amount of $300,000.00. On March 5, 2020, the Defendant breached again when he failed to pay $400,000.00 as required.

183.   As a direct consequence of Defendant's actions, the Plaintiff has been harmed and was forced to retain counsel to bring this action.

WHEREFORE, Plaintiff demands judgment in its favor and against the defendants, jointly and severally as follows:

A. Damages in the amount of $400,000.00; and
B. Pre-judgment interest from the date the monies were paid;
C. Attorney's fees and costs incurred in bringing this action;
D. Any other and further relief this court deems proper.

## COUNT VII
## UNJUST ENRICHMENT

184.   Plaintiff adopts and re-alleges paragraphs 1-183 as stated herein.

185.   Plaintiff conferred a benefit on the Defendant, to-wit: $200,000.00, who has knowledge of the benefit.

186.   The Defendant accepted the monies and retained the conferred benefit.

187.   Under the circumstances stated herein, it would be inequitable for the Defendant to retain the benefit without paying the Plaintiff for it.

WHEREFORE, Plaintiff demands judgment in its favor and against the defendants, jointly and severally as follows:

A. Damages in the amount of $200,000.00; and

B. Pre-judgment interest from the date the monies were paid;

C. Attorney's fees and costs incurred in bringing this action;

D. Any other and further relief this court deems proper.

### COUNT VIII
### VIOLATION OF FLORIDA'S DECEPTIVE
### AND UNFAIR TRADE PRACTICES ACT

188.    The Plaintiff adopts and re-alleges paragraphs 1-187 as stated herein. Plaintiff further would show:

189.    At all times material the Plaintiff's were "consumers" as defined in the Florida Statutes, Title XXXIII Regulation of Trade, Commerce, Investments, and Solicitations, Chapter 501 Consumer Protection Part II, the Florida Deceptive and Unfair Trade Practices (Act) (hereinafter "the Act") (§§ 501.201-501.213), § 501.203 (7), as "individuals."

188. At all times material the Plaintiffs were "interested parties or persons" as defined in the Act, § 501.203 (6), as persons affected by a violation of the Act.

189. At all times material Narconon engaged in "trade or commerce," as defined in the Act, § 501.203(8), by advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated, including the conduct of any trade or commerce, however denominated.

190. At all times material, Defendants engaged in the aforesaid trade or commerce with a "thing of value" as defined in the Act, § 501.203(9) to include, without limitation, moneys, certificate, benefit, credential, interest, or professional opportunity which includes to wit: the $200,000.00 in funds received, in exchange for a percentage of

a petroleum transaction."

189.    At all times material Defendant violated the Act § 501.204(1) and (2) by engaging in unconscionable acts or practices, and/or unfair or deceptive acts or practices in the conduct of any trade or commerce.

190.    At all times material Plaintiffs were mislead as consumers and they were aggrieved by Defendant's violations of the Act.

191. At all times material Plaintiffs acted reasonably in the circumstances.

192. At all times material the aforementioned conduct, material misrepresentations and material omissions were unconscionable, unfair, deceptive, and likely to cause injury to a reasonable relying consumer.

193. At all times material, the aforesaid conduct, material misrepresentations and material nondisclosures were likely to mislead consumers.

194. The Plaintiffs have had to retain the undersigned attorney to represent them in connection with this matter and are responsible to pay their attorney a reasonable attorney's fee for the services rendered in connection herewith.

195. Pursuant to Fla. Stat. § 501.211 because the Plaintiffs have suffered losses as a result of violations of this part, they are entitled to recover actual damages, plus attorney's fees and court costs as provided in Fla. Stat. § 501.2105 from Defendants.

196. As a direct and proximate result the Plaintiffs have been damaged.

WHEREFORE, the Plaintiffs demand an award for damages against Defendants for $200,000, prejudgment interest, reasonable attorney's fees, taxable costs incurred in connection with the maintenance of this action, and for any other and further relief.

## COUNT IX
## PIERCE THE CORPORATE VEIL OF IBEX ENEREGY, INC.

197. The Plaintiff adopts and re-alleges paragraphs 1-196 as stated herein.

Plaintiff further would show:

198. Paul Bernard was an officer, director, and shareholder of Ibex Energy, Inc.

199. Paul Bernard was the sole shareholder of Ibex Energy, Inc.

200. Paul Bernard used Ibex Energy, Inc., for the sole purpose of committing fraud.

201. The fraudlent and improper use of the corporate form of Ibex Energy, Inc., caused injury to the Plaintiff.

202. As a result of the fraud, the Plaintiff should be allowed to peirce the corporate veil.

203. As a result of being allowed to pierce the veil, the Defendant should be liable individually.

204. As a direct and proximate result the Plaintiffs have been damaged.

WHEREFORE, the Plaintiffs demand an award for damages against Defendants for $200,000, prejudgment interest, reasonable attorney's fees, taxable costs incurred in connection with the maintenance of this action, and for any other and further relief.

## DEMAND FOR JURY TRIAL

Plaintiff, by the undersigned, Alex R. Stavrou, P.A., hereby demands a trial by jury on all matters properly triable by jury under the laws of the United States and the State of Florida.

Dated: July 14, 2020

Respectfully Submitted,

*/S/ ALEX R. STAVROU, ESQ.*

ALEX R. STAVROU, ESQUIRE
The Law Office of Alex R. Stavrou, P.A.
300 South Hyde Park Ave.
Tampa Florida, 33606
(813) 251-1289x1
fax (813) 489-2528
FL BAR # 0108390
Attorney for the Plaintiff
alex@alexstavrou.com